Filed 12/26/23  S.T.I. Demolition v. Quarles CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| S.T.I. DEMOLITION, INC., | B328395 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TC022945) |
| v. | |
| CHARLES QUARLES, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Peter Michael Shultz, Judge.  Affirmed.

Law Offices of Henry N. Jannol and Rebecca D. Wester for Defendant and Appellant.

Attlesey Ward and John P. Ward for Plaintiff and Respondent.

_____

Defendant Charles Quarles, president and chief executive officer of the Bedford Group (Bedford), appeals from an order finding he was Bedford's alter ego. We affirm.

In 2011, plaintiff and respondent S.T.I. Demolition, Inc. (STI), obtained a judgment against Bedford (the judgment) and later sought to add Quarles as a judgment debtor. The trial court initially denied STI's motion, and, in a prior appeal, we reversed because the trial court did not analyze all the elements of alter ego liability. Upon remand, the trial court granted STI's motion to add Quarles as a judgment debtor.

In the current appeal, although Quarles challenges the sufficiency of evidence to support two elements of alter ego liability, Quarles fails to summarize the evidence at all, let alone in the light most favorable to the trial court's order as required by our standards of review. As set forth in our Discussion, *post*, substantial evidence supports the trial court's order. Quarles also argues the trial court erred in failing to consider evidence of purported prejudice supporting his laches affirmative defense. Quarles ignores our standard of review in failing to argue that the evidence compelled application of laches to bar STI's efforts to add him to the judgment. The record, moreover, shows the trial court did consider the evidence, but found it not dispositive.

## BACKGROUND

Because this is the second appeal regarding whether Quarles was Bedford's alter ego, we incorporate our description of the factual and procedural background from our prior opinion.

1.    *Judgment*

"In February 2011, after a bench trial, STI obtained a judgment against Bedford for $108,863.70. In its judgment

2

renewal dated August 7, 2020, STI indicated Bedford owed it $212,571.58." (*S.T.I. Demolition, Inc. v. Quarles* (July 27, 2021, B307978) [nonpub. opn.] (*Quarles I*).)

### 2. *Debtor's examination*

"On August 21, 2019, STI filed an application and order for a debtor's examination. On September 26, 2019, John Ward, counsel for STI, examined Quarles as Bedford's representative. No reporter was present." (*Quarles I*, *supra*, B307978.)

### 3. *STI moved to amend the judgment*

"On June 3, 2020, STI filed a motion to amend the judgment to add Quarles as a judgment debtor. STI argued that Quarles was Bedford's alter ego.

"In support of the motion, the president of STI, Ralph Rodriguez, averred that STI and Bedford entered into a written contract on an unspecified date. According to Rodriguez, Bedford failed to pay STI, and STI obtained a judgment against Bedford in February 2011. Rodriguez stated that Quarles appeared at trial. Rodriguez believed that Bedford continues to operate because it has a website and is registered with the California Secretary of State. Specifically, in May 2019, Bedford filed a statement of information with the Secretary of State signed by Quarles as Bedford's president.

"Attorney Ward filed a declaration stating that Quarles appeared on behalf of Bedford at a debtor's examination that Ward conducted on September 26, 2019. According to Ward, Quarles testified that Quarles always owned 100 percent of Bedford's shares, and since 2012, Bedford has had no employees. Quarles told Ward that, in 2012, Bedford sold all of its assets and currently owns no assets and has no bank accounts. Ward

3

averred that Quarles testified he continues to conduct business out of Bedford's offices and uses the following e-mail: cquarles@thebedfordgroup.com.  Additionally, Bedford maintains a website.  Ward reported that Quarles testified Bedford is 'essentially defunct' and Quarles did not shut it down because the website attracts customers to his consulting business and it would cost him $10,000 to 'shut down Bedford and discharge its debts via bankruptcy.'

"According to Ward, Mr. Quarles stated that, at an unspecified date, Bedford prevailed in an arbitration against Zurich Insurance and obtained a $17 million arbitration award.  'Mr. Quarles stated that he used $2,000,000 of the award to satisfy a debt owed to Hanmi Bank secured by his personal residence' on Kenway Drive (the Kenway Property).  Ward reported that 'Mr. Quarles stated Hanmi Bank agreed to sell the note to his nephew Darren Gooden so Mr. Quarles would not lose [the] Kenway [Property] to Hanmi.'  Ward explained that Quarles testified 40 percent of the arbitration award was used to pay Bedford's attorneys and an unspecified amount was used to pay City National Bank for a line of credit.

"Documents attached to STI's motion to amend the judgment showed that in March 1998, Bedford conveyed the Kenway Property by grant deed to Charles and JoAnn Quarles.  Charles Quarles signed the deed as president of Bedford.  The deed states:  ' "The grantors and the grantees in this conveyance are comprised of the same parties who continue to hold the same proportionate interest in in [*sic*] the property, R & T 11923(d)." '  (Capitalization omitted.)

"In 2006, Charles and JoAnn Quarles transferred a deed of trust on the Kenway Property to Hanmi Bank.  In June 2012,

4

Hanmi Bank filed a notice of default and election to sell indicating that Charles and JoAnn Quarles owed $16,509,082.58. On January 8, 2018, Hanmi Bank assigned the deed of trust to the Gooden Group, Inc., whose managing director was Darren Gooden. It is undisputed that Darren Gooden is Quarles's nephew and was a former employee of Bedford." (*Quarles I*, *supra*, B307978.)

### 4. *Quarles's opposition*

"Charles Quarles opposed STI's motion arguing, among other things, that Bedford's 'payment to Hanmi Bank was a payment of a business debt because the bank required Mr. Quarles to collateralize his home in order to secure a $37 million construction loan from the bank to the Bedford Group.' (Capitalization omitted.) Quarles also argued that the equitable doctrine of laches prevented STI from adding him as a judgment debtor.

"In his declaration in opposition to STI's motion, Quarles stated he was the former president and former chief executive officer of Bedford. Bedford was involved in the construction of a condominium complex in Oakland, California (Oakland Property). Hanmi Bank entered into a construction agreement with Bedford and other entities to loan money to Thomas Berkley Square Housing, LLC for the construction of the Oakland Property. The loan was secured not only by the Oakland Property, but also by Charles and JoAnn Quarles's personal residence. According to Quarles, he signed a commercial guaranty of Hanmi Bank's loan to Thomas Berkley Square Housing, LLC for the construction of the Oakland Property secured by his personal residence.

"Quarles averred that when Thomas Berk[ ]ley Square Housing, LLC defaulted on the loan, Hanmi Bank sold the Oakland Property and commenced litigation against both Charles and JoAnn Quarles for the outstanding indebtedness. Hanmi [B]ank agreed to postpone its trustee sale of the Kenway property, and on the day before the scheduled foreclosure sale, JoAnn Quarles filed for bankruptcy. According to Quarles, during the bankruptcy, Quarles reached a settlement agreement with Hanmi wherein it would be paid $1.2 million in satisfaction of its loan.

"According to Quarles, Bedford obtained insurance proceeds from litigation concerning the Oakland Property 'around' September 2014. Quarles 'used the proceeds' from litigation against the insurer of the Oakland Property to pay the first $1 million of the latter settlement with Hanmi Bank. Quarles did not identify the recipients of the remaining insurance proceeds or dispute Ward's declaration that Bedford recovered $17 million from the insurer. According to Quarles, 'I did not divert corporate funds for my own personal use. My payment to Hanmi Bank . . . was for a debt that was incurred for a business purpose. . . . While part of the debt was secured by . . . my home, I had to allow Lender [Hanmi Bank] to collateralize my home in order for the construction loan to be provided to the Bedford Group.'

"According to Quarles, Bedford ceased doing business in 2013. Quarles explained that he continued using the e-mail address 'because that is the only e-mail address [he] ha[s] ever used.' Bedford 'still maintains a website because [Mr. Quarles] hope[s] that business may be revived again someday.' " (*Quarles I, supra*, B307978.)

### 5. *Prior appeal*

In the prior appeal, STI appealed from the trial court's order denying its motion to add Quarles as a defendant to the judgment. We reversed, concluding that the trial court did not evaluate all the factors relevant to whether Quarles should be added the judgment as Bedford's alter ego. (*Quarles I, supra,* B307978.)

### 6. *STI files a new motion to amend the judgment; Quarles opposes the motion; and STI files a reply*

On remand, STI filed the same motion and supporting documentation that it filed in its original motion to add Quarles as a judgment debtor. Quarles opposed Quarles's new motion by relying substantially on his same declaration described above. (Quarles shortened the declaration and changed the designation of exhibits.)

With respect to laches, Quarles argued the doctrine barred STI from adding him as a judgment debtor. Quarles contended that STI should have taken a debtor's examination earlier and that he was prejudiced because "documents have been destroyed for a number of years now that would surely aid Mr. Quarles in mounting a defense to Plaintiff's [STI's] claims." Quarles also argued that the testimony of his accountant would be "critical" to refute the alter ego allegations.

In its reply, STI countered the laches argument, stating Quarles had not demonstrated prejudice because STI's motion was based on Quarles's admissions, not on Bedford's records. STI argued the alleged lost records were "irrelevant."

On appeal, Quarles does not summarize the evidence supporting STI's motion or the evidence in opposition. He merely

7

states: "The renewed motion was filed on December 1, 2022 [citation] and the opposition was filed January 19, 2023. [Citation]. STI renewed its reply on January 26, 2023. [Citation.] Ultimately, on February 2, 2023, the trial court ruled that Quarles was the alter ego of Bedford."

## 7.    *Trial court's order*

Quarles does not describe the trial court order. Instead, he contends: "Ultimately on February 2, 2023, the trial court ruled that Quarles was the alter ego of Beford. [Citation.] [¶] Based on the reasons set forth herein, the trial court should be reversed."

In its order, the trial court emphasized that Quarles "owns 100% of Bedford's shares." The court found Bedford had no employees but according to the Secretary of State, maintained its corporate status. The trial court also emphasized that Bedford had obtained a $17 million arbitration award against Zurich Insurance after Quarles claimed Bedford had no assets or bank accounts. The court found Quarles continues to conduct business as a real estate consultant in Bedford's offices. The court further found that Bedford's books and records have been destroyed. (Quarles does not dispute these findings.)

The court concluded from this evidence that Bedford was inadequately capitalized and did not maintain corporate formalities.

With respect to laches, the court noted Quarles's argument he was prejudiced by STI's delay in seeking to add him to the judgment because Bedford's records had been destroyed and its accountant had died. The trial court found that after taking the debtor exam, STI did not delay unreasonably in seeking to add Quarles to the judgment. The court explained that STI acted

8

reasonably in pursuing the judgment against Bedford because Quarles admitted that he hoped the business would be revived. The court also found that Bedford's lack of records was caused by Bedford's own failure to maintain its records when its accountant died.

## DISCUSSION

To prevail on a motion to add a judgment debtor as an alter ego of a corporation, STI must demonstrate that " '(1) the parties to be added as judgment debtors had control of the underlying litigation and were virtually represented in that proceeding; (2) there is such a unity of interest and ownership that the separate personalities of the entity and the owners no longer exist; and (3) an inequitable result will follow if the acts are treated as those of the entity alone.' [Citation.]" (*Quarles I*, *supra*, B307978, quoting *Relentless Air Racing, LLC v. Airborne Turbine Ltd. Partnership* (2013) 222 Cal.App.4th 811, 815–816.)

Quarles does not dispute the trial court's ruling as to the first element. Quarles, however, takes issue with the trial court's findings as to the remaining two elements in arguing no substantial evidence supported them. Quarles also argues the trial court should have found in his favor as to his laches defense.

A. **Quarles Forfeited His Substantial Evidence Challenge to the Trial Court's Unity of Interest Findings By Failing To Summarize the Evidence In Accordance With Our Standard of Review; Even If Preserved, the Argument Lacks Merit**

In our prior opinion, we explained the criteria for determining whether Bedford and Quarles shared a unity of interest. We incorporate that analysis immediately below.

9

"Our jurisprudence has identified several factors a trial court must consider in deciding whether a corporation and an individual are alter egos.  These factors include:  'Commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses [citations]; the treatment by an individual of the assets of the corporation as his own [citations]; the failure to obtain authority to issue stock or to subscribe to or issue the same [citations]; the holding out by an individual that he is personally liable for the debts of the corporation [citations]; the failure to maintain minutes or adequate corporate records, and the confusion of the records of the separate entities [citations]; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; sole ownership of all of the stock in a corporation by one individual or the members of a family [citations]; the use of the same office or business location; the employment of the same employees and/or attorney [citations]; the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization [citations]; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation [citations]; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities [citations]; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities [citations]; the use of the corporate entity

10

to procure labor, services or merchandise for another person or entity [citations]; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another [citations]; the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions [citations]; and the formation and use of a corporation to transfer to it the existing liability of another person or entity [citations].' [Citation.]" (*Quarles I*, *supra*, B307978, quoting *Associated Vendors, Inc. v. Oakland Meat Co., Inc.* (1962) 210 Cal.App.2d 825, 838–840.)

Quarles contends no substantial evidence supported the trial court's finding of unity of interest between Bedford and Quarles. Quarles has forfeited this argument. " 'A party who challenges the sufficiency of the evidence to support a particular finding must summarize the evidence on that point, favorable and unfavorable, and show how and why it is insufficient. [Citation.]' [Citation.] Where a party presents only facts and inferences favorable to his or her position, 'the contention that the findings are not supported by substantial evidence may be deemed waived.' [Citation.]" (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738, italics omitted.) Here, Quarles does not summarize any of the evidence—either favorable or unfavorable. He therefore has forfeited his challenge to the sufficiency of the evidence supporting the trial court's finding of a unity of interest with Bedford.

On its merits, Quarles's challenge also fails. In *Quarles I*, we summarized the following evidence supporting a unity of

11

interest between Bedford and Quarles: "Quarles in his capacity as president of Bedford transferred the Kenway [P]roperty to Charles and JoAnn Quarles representing that Bedford and the Quarles's were the 'same parties.' (Capitalization omitted.) Hanmi Bank assigned the deed of trust on the Kenway Property to the Gooden Group, Inc., whose managing director was Darren Gooden, a former employee of Bedford and Quarles's nephew. Although Bedford has stopped conducting business in 2013, Bedford maintains offices, a website, and an e-mail address. Quarles operates his consulting business in the same offices. Bedford received $17 million in insurance proceeds in 2014 after Bedford 'went out of business.' In 2019, Quarles continued to represent to the California Secretary of State that he was Bedford's 'president.' (Capitalization omitted.) According to Quarles, his current use of Bedford's website benefits Quarles's consulting business." (*Quarles I*, *supra*, B307978.)

Quarles argues the trial court should have considered Bedford's capitalization at the time of formation, not when Bedford received the $17 million arbitration award. Quarles identifies *no* evidence supporting his statement that Bedford was adequately capitalized at the time of its inception. Even assuming Bedford were adequately capitalized at the time of its inception, the evidence described above would still constitute substantial evidence of a unity of interest between Bedford and Quarles.

Quarles also argues the trial court erred in finding the absence of evidence that Bedford adhered to corporate formalities. Quarles cites no evidence that Bedford maintained corporate formalities and the record shows otherwise. Significantly, the record shows Bedford received a $17 million

12

insurance payment that was never deposited into Bedford's bank account. As the president, chief executive officer, and sole shareholder, Quarles's silence on what happened to the money he received from Zurich Insurance supports the inference that he diverted it to his personal use.

**B.      Quarles Has Forfeited His Contention that Substantial Evidence of an Inequitable Result was Lacking; Substantial Evidence Supported That It Would Be Inequitable To Treat Quarles as Separate from Bedford**

Quarles argues no substantial evidence supported the trial court's finding that it would be inequitable to treat Quarles and Bedford as separate entities. Quarles has forfeited this argument by failing to summarize the evidence in the light most favorable to the trial court's order. (*Schmidlin v. City of Palo Alto*, *supra*, 157 Cal.App.4th at p. 738.)

The argument also fails on its merits. *Butler America, LLC v. Aviation Assurance Co., LLC* (2020) 55 Cal.App.5th 136, 147 holds that a judgment debtor's inability to collect on a judgment may be evidence of an inequitable result. *Butler* further explained: "In applying the alter ego doctrine, no particular findings are necessary, but the conditions under which a corporate entity should be ignored vary according to the circumstances of each case." (*Id*. at p. 146.) Alter ego "is an equitable doctrine and, though courts have justified its application through consideration of many factors, their basic motivation is to assure a just and equitable result." (*Alexander v. Abbey of the Chimes* (1980) 104 Cal.App.3d 39, 48.)

Here, there was evidence STI has been unable to collect on the judgment because Quarles shut down Bedford in 2013 shortly

13

before Bedford received a $17 million insurance award the following year.  This evidence creates the inference Bedford could not pay its debt to STI because Quarles diverted the 2014 insurance proceeds from Bedford.[1]  To use Quarles's nomenclature, the disappearance of the $17 million and Quarles's silence as to its location supports the inference that he "raid[ed] the corporate coffers," which Quarles acknowledges would be an inequitable result for purposes of alter ego.  Additionally, STI presented evidence Quarles told STI's attorney, that in 2012, Bedford had sold all its assets, and in 2019, owned no assets and has no bank accounts.  Quarles's silence as to what happened to Bedford's assets sold in 2012 when Bedford still owed STI money also supports the trial court's finding that it would be inequitable to treat Bedford and Quarles—Bedford's president, CEO, and sole shareholder—as separate entities.

---

[1] Quarles also incorrectly interprets our prior opinion for the proposition that "the Appellate Court agreed that Quarles did not divert funds from Bedford Group to pay for a personal obligation."  Although we concluded that in interpreting the evidence in the light most favorable to Quarles, a trier of fact could find the Hanmi Bank transaction was a corporate transaction, at that time, we were considering the evidence in the light most favorable to Quarles, the then prevailing party below. (*Quarles I*, *supra*, B307978.)  In the current appeal, STI prevailed below and thus we consider the evidence in the light most favorable to STI.  In any event, we have not relied upon the Hanmi Bank transaction.  The record contains other substantial evidence supporting the trial court's findings.

**C.** **Quarles Does Not Argue the Evidence Compelled a Finding in His Favor as to His Laches Defense; Moreover, the Record Does Not Support That Conclusion**

" ' "Laches is an equitable defense based on the principle that those who neglect their rights may be barred from obtaining relief in equity. [Citation.]" ' " (*Golden Gate Water Ski Club v. County of Contra Costa* (2008) 165 Cal.App.4th 249, 263.) " 'The existence of laches is a question of fact to be determined by a weighing of all of the applicable circumstances by the trial judge.' [Citation.]" (*Quarles I, supra*, B307978, quoting *Rouse v. Underwood* (1966) 242 Cal.App.2d 316, 323.) On remand, the trial court rejected Quarles's laches defense. Where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. (*Roesch v. De Mota* (1944) 24 Cal.2d 563, 570–571.)

Quarles argues, "The trial court's examination of Quarles' laches defense was flawed in that it failed to consider the prejudicial impact of the passage of time between the judgment in 2011 and the debtor examination in 2019. According to Quarles, he was "severely prejudiced . . . by the loss of the books and records of Bedford Group as well as the loss of the accountant, James Williams, who died in 2016 and is no longer available to testify."

Quarles's argument rests on the incorrect premise that the trial court failed to consider Quarles's claim that STI's delay in seeking to add him to the judgment was prejudicial because of the intervening destruction of corporate records and his accountant's death. In fact, the court acknowledged Quarles's

15

contention that "he will suffer substantial prejudice since all records of Bedford have been destroyed, and its accountant died." The trial court just was not convinced that this evidence merited applying laches to bar STI's efforts to add Quarles to the judgment. The trial court instead concluded inter alia that the absence of records was caused by Bedford's failure to maintain its records when its accountant died.

Quarles does not argue on appeal that as a matter of law, he would suffer such prejudice from STI's delay in taking the debtor's exam to merit barring it from adding him as a judgment debtor. Had he made that argument, we would reject it. Although Quarles's accountant and any corporate books held by the accountant theoretically could have been useful to Quarles, Quarles does not show this evidence was unique. Quarles was the president, chief executive officer, and sole shareholder of Bedford and his multiple roles support the inference that he would have been privy to information available to Bedford's accountant. Quarles fails to identify any evidence supporting the inference that the deceased accountant's books were the only source of information concerning Bedford's assets or other information relevant to alter ego analysis.

Finally, in his opposing declaration, Quarles indicates, "I had sued the contractor's insurance carrier (Zurich Insurance)" and later obtained $17 million for a construction project "Bedford Group, Inc. was involved in . . . ." Quarles further indicates he used $1 million of the proceeds for a specific purpose but fails to identify where the remainder of insurance proceeds went. According to Quarles, he received that money after Bedford "went out of business" and Quarles does not explain why Bedford's accountant would have had critical knowledge as to money

16

received after Bedford went out of business. In short, Quarles does not show that as a matter of law, laches forecloses STI from adding Quarles as a judgment debtor.

## DISPOSITION

The trial court's order is affirmed. STI Demolition, Inc. shall have its costs on appeal.

<u>NOT TO BE PUBLISHED.</u>

BENDIX, J.

We concur:

ROTHSCHILD, P. J.

CHANEY, J.